# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **CARLOS EDWARD VANCE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv00019 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Carlos Edward Vance, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

Case 1:08-cv-00019-JPJ-PMS   Document 21   Filed 05/28/09   Page 1 of 27   Pageid#: 522

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Vance protectively filed his current applications for DIB and SSI on July 28, 2006, alleging disability as of September 10, 1993, due to back pain, knee pain, pain in the feet, history of a gunshot wound and a nervous condition. (Record, ("R."), at 131, 135, 151, 161.) The claims were denied initially and upon reconsideration. (R. at 62-64, 67-69, 74, 75-76, 78-79, 80-81, 84-85.) Vance then requested a hearing before an administrative law judge, ("ALJ"). (R. at 86.) The ALJ held a hearing on October 31, 2007, at which Vance was represented by counsel. (R. at 24-57.)

By decision dated January 23, 2008, the ALJ denied Vance's SSI claim. (R. at 13-23.) The ALJ found that Vance had not engaged in substantial gainful activity since July 28, 2006, the application date. (R. at 15.) The ALJ determined that the medical evidence established that Vance suffered from severe impairments, namely chronic back pain, osteoarthritis of the right knee, degenerative joint disease of the hands and feet, chronic obstructive pulmonary disease, ("COPD"), status post gunshot wound to the left shoulder/back, depression and anxiety. (R. at 15.) However, the ALJ found that Vance did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) In addition, the ALJ found that Vance had the residual functional

capacity to perform light work[1] limited by an inability to perform more than occasional climbing, stooping, kneeling, crouching and crawling, by an inability to work at unprotected heights, around hazards or machinery and around extremes of cold, pollutants/irritants or vibrations. (R. at 17.) The ALJ further found that Vance needed to freely alternate between sitting and standing, he could have only occasional interaction with the general public and he was limited to the performance of unskilled, routine and repetitive tasks. (R. at 17.) Thus, the ALJ found that Vance was unable to perform any of his past relevant work. (R. at 21.) Based upon Vance's age, marginal education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that he could perform, including those of a bagger, a price changer and a small parts assembler. (R. at 22.) Therefore, the ALJ concluded that Vance was not under a disability as defined in the Act and was not entitled to SSI benefits. (R. at 22-23.) *See* 20 C.F.R. § 416.920(g) (2008).

In a separate decision dated the same day, the ALJ denied Vance's DIB claim. (Docket Item No. 16, ("Plaintiff's Brief"), Exh. A.)[2] The ALJ found that Vance met the insured status requirements of the Act for DIB purposes through December 31, 1995.[3] (Plaintiff's Brief, Exh. A at 3.) The ALJ further found that Vance had not

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

[2]The DIB decision is not contained in the administrative record on appeal. However, the plaintiff has attached a copy of this decision to his brief.

[3]Thus, for purposes of this court's review of the ALJ's DIB decision, the relevant issue is whether Vance was disabled at any point from September 10, 1993, the date of alleged onset, through December 31, 1995, the date last insured.

engaged in substantial gainful activity between September 10, 1993, his alleged onset date, through December 31, 1995, his date last insured. (Plaintiff's Brief, Exh. A at 3.) The ALJ found that, through the date last insured, Vance had severe impairments, namely chronic back pain, osteoarthritis of the right knee and degenerative joint disease, but she found that he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Plaintiff's Brief, Exh. A at 4.) The ALJ concluded that, through the date last insured, Vance had the residual functional capacity to perform light work, limited by occasional climbing, stooping, kneeling, crouching and crawling, an inability to work at unprotected heights or around hazards/hazardous machinery, and which allowed for a sit/stand option. (Plaintiff's Brief, Exh. A at 4.) Based on his age, marginal education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, Vance was unable to perform his past relevant work. (Plaintiff's Brief, Exh. A at 6.) The ALJ concluded that, through the date last insured, jobs existed in significant numbers in the national economy that Vance could perform, including those of a bagger, a price changer and a small parts assembler. (Plaintiff's Brief, Exh. A at 7.) Thus, the ALJ found that Vance was not disabled at any time from September 10, 1993, through December 31, 1995. (Plaintiff's Brief, Exh. A at 7.) *See* 20 C.F.R. § 404.1520(g) (2008).

After the ALJ issued her decisions, Vance pursued his administrative appeals, (R. at 6-9), but the Appeals Council denied his request for review. (R. at 1-5.) Vance then filed this action seeking review of the ALJ's unfavorable decisions, which now stand as the Commissioner's final decisions. *See* 20 C.F.R. §§ 404.981, 416.1481

(2008). The case is before this court on Vance's motion for summary judgment filed January 20, 2009, and the Commissioner's motion for summary judgment filed February 19, 2009.

## II. Facts

Vance was born in 1959, (R. at 118), which classifies him, both at the time of his date last insured and at the time of the ALJ's decisions, as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a seventh-grade education[4] and past relevant work as a scoop operator in the coal mines and a miner's helper. (R. at 28, 51, 152, 155.)

At the hearing on October 31, 2007, Vance testified that he last worked in the coal mines in 1993. (R. at 29.) He stated that he could no longer work due to back and knee problems. (R. at 29.) He stated that he experienced pain daily, for which he took ibuprofen, Ultram and over-the-counter medications. (R. at 30.) Vance further testified that he had arthritis in his feet and pain in his hands, which he also attributed to arthritis. (R. at 31-32.) He testified that he also had difficulty breathing, which he attributed to working in the mines and smoking for 30 years. (R. at 32-33.) However, he noted that he had stopped smoking, which had helped this condition. (R. at 33.) Vance testified that he also took medication for back and leg pain resulting from a pinched nerve, which helped. (R. at 33.) He stated that this pain occurred when lying

---

[4]Vance testified at his hearing, and he indicated in his Disability Report, that he completed the sixth grade at the age of 14. (R. at 155.) However, school records show that he completed the fifth grade three times before being promoted to the seventh grade. (R. at 189.) There is no mention in the school records of Vance ever attending any sixth-grade classes. (R. at 189.) Thereafter, he completed one semester of his eighth-grade school year. (R. at 188.)

-5-

in the same position for two to three hours or from driving long distances. (R. at 33-34.)

Vance testified that he had difficulty standing and sitting, opining that he could stand for approximately 20 minutes without interruption. (R. at 35-36.) He stated that, in order to wash dishes, he had to lean against the sink and support himself with his forearms. (R. at 36.) He stated that he could sit "for hours" if he had armrests to shift his weight. (R. at 37.) However, without armrests, he opined that he could sit for 15 minutes. (R. at 38.) He estimated that he could walk a quarter of a mile, or approximately five minutes, without interruption. (R. at 38.) He stated that he could lift a gallon of milk. (R. at 35.) Vance testified that he had difficulty kneeling, especially on his right knee, due to knee pain. (R. at 39-40.) He stated that if he bent over, he could not get back up well. (R. at 40.) Vance also testified to difficulty twisting at the waist. (R. at 41.) However, he stated that he did not use a cane or a walker. (R. at 50.)

Vance testified to difficulty sleeping, noting that he averaged around five to six hours per night, but interrupted. (R. at 42.) He stated that he moved between a soft couch to a hard bed all night long. (R. at 42.) Vance also stated that he had to lie curled up, noting that he could not stretch out on his back. (R. at 42.) He opined that he could drive for approximately 30 minutes, stating that he drove to the post office, which was approximately 15 minutes away. (R. at 43.) However, he stated that he did not like to go places because he did not like "being looked at" and being judged. (R. at 43-44.) Vance testified that being around co-workers he did not know would make him anxious. (R. at 46.) He also stated that he experienced panic attacks that

-6-

prevented him from going places. (R. at 48.) Vance stated that he would tear up, but not cry. (R. at 49.) He further testified that he stayed nervous and that he had seen Crystal Burke, a licensed clinical social worker, for the previous six months, although she had prescribed no medications. (R. at 30-31.) Vance testified that he had battled a drinking problem in the past, but no longer did so. (R. at 34.)

James Williams, a vocational expert, also was present and testified at Vance's hearing. (R. at 50-56.) Williams classified Vance's past work as a scoop operator as medium[5] and semi-skilled. (R. at 51-52.) Williams testified that an individual who could perform light work limited by an inability to work around irritants, extreme cold or humidity, who could not work around hazardous machinery, who could not climb ladders, ropes and scaffolds or work on high grade surfaces and who required a sit/stand option could not perform Vance's past work as a scoop operator. (R. at 52.) However, Williams testified that the same individual of Vance's age, education and work experience could perform other jobs that existed in significant numbers in the national economy, including those of a bagger in a dry cleaning establishment, a price changer marker and a small parts assembler. (R. at 52-53.) Williams stated that the same hypothetical individual who also was limited to unskilled, repetitive routine work that did not require interactions with the general public could not perform Vance's past work as a scoop operator. (R. at 53.) However, he testified that such an individual could perform the jobs previously enumerated. (R. at 53.) Williams was next asked to consider the first hypothetical individual, but who also had to lie down approximately 30 to 40 percent of the day. (R. at 53-54.) Williams testified that such

---

[5]Medium work involves lifting items weighing up to 50 pounds at a time with occasional lifting and carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

Case 1:08-cv-00019-JPJ-PMS   Document 21   Filed 05/28/09   Page 7 of 27   Pageid#: 528

an individual could not perform any jobs. (R. at 54.) Likewise, Williams testified that the same individual who also had no useful ability to deal with co-workers or supervisors could not work. (R. at 55.) Finally, Williams testified that an individual who suffered from agoraphobia that might often result in an inability to get to work, could not perform any substantial gainful activity. (R. at 56.)

In rendering his decision, the ALJ reviewed records from Virginia Public Schools; Humana Hospital - Clinch Valley; Dr. S.R. Hoebelheinrich, M.D.; Sayers Chiropractic; Stone Mountain Health Services; Thompson Family Health Center; Dr. Leon Kircik, M.D.; Mary Ann Collins, F.N.P.; Dr. N. Zafar, M.D.; M. Vermillion, F.N.P.; Johnston Memorial Hospital; Dr. William Humphries, M.D.; Dr. Richard Surrusco, M.D., a state agency physician; Crystal Burke, a licensed clinical social worker; UVA Imaging; and Melinda M. Wyatt, M.S., a licensed psychologist.

On January 14, 1993, Vance underwent surgical removal of a mass of the right axilla and a pilonidal cyst[6] by Dr. E. Khuri, M.D. (R. at 197, 200-01.) He recovered well and experienced no complications from the surgery. (R. at 195.) From August 11, 1997, to July 24, 1998, Vance saw M. Vermillion, F.N.P. with Thompson Family Health Center. (R. at 282-89.) His physical examinations were consistently normal, with the exception of elevated blood pressure readings and elevated cholesterol levels. (R. at 282, 284, 286, 288, 316-17.) Vermillion diagnosed him with hypertension, a history of right knee trauma and a history of hyperlipidemia. (R. at 283, 285, 287, 289.) Vance informed Vermillion that he wished to control his cholesterol with diet,

_____

[6]A pilonidal cyst is a hair-containing sacrococcygeal dermoid cyst or sinus which often opens at a post anal dimple. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 422 (27th ed. 1988.)

not medication. (R. at 282.) Vermillion prescribed Norvasc, advised Vance to follow a low-fat, low-cholesterol diet and advised him to stop smoking and stop drinking alcohol. (R. at 283, 285, 287, 289.)

On September 26, 1998, Vance presented to Clinch Valley Medical Center with a gunshot wound to the left shoulder. (R. at 212-23.) A CT scan of the chest showed the bullet lodged in the T6 vertebral body with associated injury to the ribs, as well as a hemothorax, for which a chest tube was inserted. (R. at 214-15, 219.) Dr. Steven R. Hoebelheinrich, M.D., noted that following placement of the chest tube, Vance was stable and neurologically intact. (R. at 218.) Orthopedic evaluation by Dr. Alain Desy, M.D., showed no need for surgical treatment for the fracture or removal of the bullet unless Vance developed additional neurologic symptoms later. (R. at 218, 223.) On September 30, 1998, Vance was discharged home to light activity, and he was prescribed antibiotics and pain medication. (R. at 218.) By November 18, 1998, Vance had no complaints, noting that his pain had resolved. (R. at 203.) Dr. Hoebelheinrich advised Vance to return to normal activity at that time. (R. at 203.)

When Vance again saw Vermillion on April 1, 1999, he complained of chronic pain in the left thoracic spine and ribs. (R. at 280.) Straight leg raise testing was negative bilaterally. (R. at 280.) Vermillion diagnosed a history of gunshot wound to the left shoulder, hypertension and hyperlipidemia, and she prescribed Lodine. (R. at 281.) His blood pressure was elevated, and the following day, when lab work revealed that Vance's total cholesterol was 259, he was prescribed Lipitor. (R. at 280, 315.) Vance saw Dr. N. Zafar, M.D., on April 13, 1999, with complaints of chronic right knee swelling resulting in difficulty walking. (R. at 279.) Dr. Zafar opined that

-9-

Vance most likely had inflammatory arthritis/monoarticular arthritis. (R. at 279.) Fluid was aspirated from the knee, and he was prescribed Motrin and Vicodin. (R. at 279.) On July 6, 1999, Vermillion noted that Vance's knee was stable with Lodine. (R. at 276.) His blood pressure was 144/108 at that time. (R. at 276.) Vance was diagnosed with hyperlipidemia, hypertension, chronic low back pain and chronic right knee pain. (R. at 277.) Vermillion prescribed Norvasc, Lipitor and Celebrex. (R. at 277.) Vance was unreceptive to Vermillion's advice to stop drinking, and he refused counseling. (R. at 277.) On October 13, 1999, Vance's physical examination was again unremarkable, with the exception of a blood pressure reading of 142/90. (R. at 274.) He indicated that he had stopped taking Lipitor due to stomach upset. (R. at 274.) He was diagnosed with hypertension under poor control and hyperlipidemia and was continued on medications. (R. at 275.) On February 7, 2000, Vance saw Mary Ann Collins, F.N.P., at Thompson Family Health Center. (R. at 272-73.) His physical examination was normal, and his blood pressure was 124/82. (R. at 272.) His diagnoses and medications remained unchanged. (R. at 273, 307.) Vance's total cholesterol was 249 at that time. (R. at 307.) On May 3, 2000, Vance stated that he never began taking Lipitor. (R. at 270, 305.) His total cholesterol was 223 at that time. (R. at 305.) On August 17, 2000, Vance's physical examination was again normal, and his blood pressure was 118/84. (R. at 268.) His diagnoses and medications again remained unchanged. (R. at 269.) The following day, Vance's total cholesterol was 229, but he again declined to use cholesterol medication. (R. at 304.)

Vance saw Collins and Dr. Zafar from August 24, 2000, through March 12, 2003. (R. at 252-67, 405-13.) Over this time period, Vance complained of left-sided

-10-

rib pain and "tunnel vision." (R. at 264, 267.) Dr. Zafar prescribed Panritis Forte and Ultram and referred him for evaluation of vision changes. (R. at 265, 267.) Also over this time period, Vance's physical examinations remained unremarkable, with the exception of elevated blood pressure readings and cholesterol levels. (R. at 252, 254, 256, 258-59, 260, 262, 264, 297-98, 405-06, 408-09, 411-12.) Vance was continued on blood pressure medications, but continued to refuse cholesterol medication. (R. at 255, 257, 259, 261-63, 265, 410, 413.) Vance also was advised to begin a low-sodium, low-cholesterol diet and to stop drinking alcohol and smoking. (R. at 253, 257, 407, 413.) He was diagnosed with visual changes, hypertension, alcohol abuse, cigarette abuse and hyperlipidemia. (R. at 253, 255, 257, 261, 263, 407, 410, 413.)

On May 3, 2003, Vance saw Dr. Leon Kircik, M.D., a dermatologist, for a biopsy of some skin on his back. (R. at 404.) He was diagnosed with superficial lymphocytic dermatitis with eosinophils and a differential diagnosis of a hypersensitivity to a drug or an arthropod assault. (R. at 404.) When Vance saw Collins on June 6, 2003, his physical examination was unremarkable. (R. at 250, 402.) He stated that he stopped taking Hyzaar the previous week per Dr. Kircik's recommendation. (R. at 250, 402.) Collins diagnosed hypertension, hyperlipidemia and sun sensitivity. (R. at 251, 403.) He was instructed to continue Norvasc, diet and stop smoking. (R. at 251, 403.)

On July 26, 2003, Vance was seen at Sayers Chiropractic with complaints of back pain. (R. at 225-27.) He rated his pain as a nine on a 10-point scale, with 10 being severe pain. (R. at 226.) He described the pain as an ache in his left lower back. (R. at 226.) Vance had decreased lumbar range of motion due to pain. (R. at

-11-

226.)  He was advised to return three times weekly until his pain reduced.  (R. at 227.)

Vance was diagnosed with pain in the sacroiliac joint.  (R. at 227.)  The record

indicates that Vance received chiropractic treatment on six subsequent visits.  (R. at

225.)  At the discontinuation of treatment on August 7, 2003, Vance continued to have

pain in his back and legs.  (R. at 225.)  However, when Vance saw Collins on

September 4, 2003, he stated that his back pain was "much better" after receiving the

chiropractic treatment.  (R. at 248, 400.)  He stated that he was not following the

recommended diet, and his blood pressure was 132/100.  (R. at 248, 400.)  Vance's

diagnoses remained unchanged, and Collins continued him on Norvasc.  (R. at 249,

401.)  Lab work showed Vance's total cholesterol to be 273, and although he was

advised to begin Zocor, he again refused.  (R. at 295, 399.)

Vance again saw Collins from March 2, 2004, through September 8, 2006.  (R.

at 237-47, 291-94, 378-98.)  Over this time period, Vance complained of some

shortness of breath, joint aches and pains and burning with urination.  (R. at 237, 378.)

Physical examinations remained unremarkable, with the exception of continued

elevated blood pressure readings and elevated cholesterol levels, and Vance was

diagnosed with uncontrolled hypertension, hyperlipidemia, chronic low back pain and

dysuria.  (R. at 237-47, 291, 293-94, 379-80, 381-82, 384-88, 390-94, 397-98.)  He

was continued on blood pressure medications, but again expressed unwillingness to

begin cholesterol medication.  (R. at 238, 240, 242, 244, 246-47, 382, 385, 391, 394,

398.)  On February 1, 2006, Vance reported that he had stopped smoking three weeks

previously.  (R. at 239, 384.)  An EKG performed the same day in response to

Vance's complaints of shortness of breath, showed no acute abnormalities.  (R. at

383.)  Vance was again advised to stop drinking alcohol.  (R. at 238, 382.)

-12-

X-rays of Vance's lumbar spine, taken on October 24, 2006, showed a transitional anomaly and suspected spondylolysis at the L5 level and mild posterior disc space narrowing at the L4-L5 level of the spine. (R. at 340.) X-rays of the right knee showed osteoarthritic changes and suspected synovial osteochondromas. (R. at 341.) The same day, Vance saw Dr. William Humphries, M.D., for a consultative examination regarding his back pain, knee pain and leg pain. (R. at 342-47.) Physical examination revealed slightly reduced range of motion of the neck and back. (R. at 344.) Dr. Humphries noted tenderness to palpation of the paraspinous muscles of the lumbar region and superior glutei, but straight leg raise testing was negative bilaterally to 90 degrees. (R. at 344.) Vance had full range of motion of the upper extremities, with the exception of some shoulder discomfort on extremes of shoulder motion. (R. at 344.) There was mild tenderness to palpation of some of the interphalangeal joints of some of the fingers in both hands, as well as some mild synovial thickening of some of these areas. (R. at 344.) The lower extremity joint range of motion was full with some mild synovial thickening of the right knee. (R. at 344.) Vance had slightly reduced motion of the right knee with minimal crepitus. (R. at 344.) Ankle and foot motion were within normal limits, and Dr. Humphries noted some mild synovial thickening with the first metatarsal-phalangeal joint and some of the interphalangeal joints of the toes of both feet. (R. at 344.)

Vance was able to get onto and off of the examination table without difficulty, he had full grip strength, and radial, median and ulnar nerve functions were intact bilaterally. (R. at 344.) Finger-to-nose test and fine manipulation test were performed adequately. (R. at 344.) Vance's gait was within normal limits except some minimal antalgia on the right side to due knee pain. (R. at 344.) He could heel and toe walk

-13-

with assistance for balance, and tandem gait was performed adequately. (R. at 344.) Vance could bear weight on both legs, and his strength was within normal limits for all four extremities. (R. at 344.) Dr. Humphries noted no specific muscle wasting, except for some minimal diminished circumference of the right calf as compared to the left and several centimeters circumference loss of the right quadriceps region as compared to the left. (R. at 344.) Vance's deep tendon reflexes were trace to 1+ and equal in both upper extremities, 2+ and equal in the knees and 1+ and equal in the ankles. (R. at 344.) There was no motor or sensory loss of the lower extremities. (R. at 344.) The lower extremities revealed no significant venous stasis changes. (R. at 345.) Dorsalis pedis pulses and posterior tibials were 1 to 2+ and equal. (R. at 345.) Dr. Humphries noted slightly diminished breath sounds bilaterally, an occasional mild expiratory wheeze and a slight increased apical diameter of the chest. (R. at 344.)

Vance was alert and fully oriented, he had intelligible and sustained speech with no aphasia, and his behavior was appropriate for the examination. (R. at 345.) Thought and idea content were within normal limits, and Vance's memory was intact for recent and remote events. (R. at 345.) Dr. Humphries opined that Vance's intelligence was within the normal range. (R. at 345.) Vance's affect was appropriate. (R. at 345.) Dr. Humphries diagnosed chronic lumbar strain, mild to moderate degenerative joint disease of the right knee, mild COPD, restless leg syndrome by history and mild degenerative joint disease in both hands and feet. (R. at 345.) Dr. Humphries opined that Vance could sit, stand and/or walk for six hours in an eight-hour workday, lift items weighing up to 50 pounds occasionally and up to 25 pounds frequently, that he could occasionally climb, kneel and crawl, but should avoid fumes. (R. at 345.)

On November 1, 2006, Dr. Richard Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Vance could perform medium work with occasional climbing, stooping, kneeling, crouching and crawling. (R. at 348-54.) He imposed no manipulative, visual or communicative limitations. (R. at 350-51.) Dr. Surrusco opined that Vance should avoid concentrated exposure to hazards such as machinery and heights. (R. at 351.) He found Vance's allegations partially credible. (R. at 354.)

An x-ray of Vance's right knee, taken on November 20, 2006, revealed a moderate to marked degree of osteoarthritis and multiple small calcifications in the posterolateral part of the knee joint. (R. at 355.) An x-ray of the lumbar spine revealed a mild degree of spur formation and osteoarthritis of the distal lumbar spine. (R. at 355.)

Vance saw Crystal Burke, a licensed clinical social worker, on two occasions from November 28, 2006, to September 18, 2007. (R. at 356, 433-34, 445.) On November 28, 2006, Vance was alert and oriented, his hygiene and grooming were fair, his mood appeared depressed, but he exhibited no psychotic features. (R. at 356.) Burke noted that Vance appeared to have some depressive symptoms. (R. at 356.) She discussed coping strategies and advised Vance to follow up in three to four weeks. (R. at 356.) However, the only other records documenting treatment with Burke are from nearly a year later on September 18, 2007.[7] (R. at 433-34, 445.) At that time, Vance reported difficulty keeping appointments due to fear of public situations. (R.

_____

[7]Burke's September 18, 2007, treatment note indicates that Vance was last seen in March 2007. (R. at 433.) However, that treatment note is not contained in the administrative record.

-15-

at 433-34, 445.) He reported a poor quality of life due to pain and intense anxieties. (R. at 433-34, 445.) Vance was oriented with intact memory, but appeared rather guarded and anxious. (R. at 433-34, 445.) She also noted symptoms of depression. (R. at 433-34, 445.) Burke diagnosed generalized anxiety disorder and a possible panic disorder with agoraphobia. (R. at 433-34, 445.) Vance was advised to follow up in three to four weeks. (R. at 433-34, 445.)

Vance again saw Collins from November 28, 2006, through July 24, 2007, with complaints of low back pain, right knee pain and bilateral foot pain with occasional numbness. (R. at 370, 373.) His blood pressure readings and cholesterol level remained elevated. (R. at 369, 374, 417, 438.) Vance continued on blood pressure medication, but declined Cymbalta and "nerve pills." (R. at 370, 372, 375, 421, 431.) Collins diagnosed hypertension, hyperlipidemia, chronic low back pain, chronic right knee pain, depression and pain and numbness in both legs. (R. at 372, 375, 421, 431, 442.)

On March 19, 2007, Vance underwent an MRI of the lumbar spine, which showed suspected bilateral L5 pars interarticularis defects, and x-rays with oblique views were recommended. (R. at 358.) The MRI also showed L5-S1 disc bulge without significant stenosis and an L4-L5 disc bulge, asymmetric on the right, with mild to moderate left neuroforaminal stenosis. (R. at 358.) Collins referred Vance to a neurosurgeon. (R. at 418, 428, 439.)

On October 29, 2007, Collins completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical), finding that Vance could both occasionally

-16-

and frequently lift items weighing less than 10 pounds, stand and/or walk for less than two hours in an eight-hour workday, sit for less than six hours in an eight-hour workday, and she found that Vance was limited in his ability to push and/or pull with both upper and lower extremities. (R. at 446-49.) Collins further found that Vance could never climb, balance, kneel, crouch, crawl and stoop, and he could reach in all directions occasionally. (R. at 447-48.) She further found that Vance was limited in his ability to see and to hear. (R. at 448.) Finally, Collins found that Vance should limit his exposure to temperature extremes, noise, vibration and hazards, such as machinery and heights. (R. at 449.)

On September 5, 1997, Vance saw Melinda M. Wyatt, M.S., a licensed psychologist, for a psychological evaluation. (R. at 452-56.) Vance indicated concerns with significant anxiety increasing in severity over the previous year, noting difficulty tolerating stores and crowds. (R. at 453.) Vance further noted being uncomfortable around others and tending to withdraw. (R. at 453.) He stated that he was frequently nervous and agitated. (R. at 453.) Vance indicated a depressed mood, but denied suicidal or homicidal ideations or psychotic processes. (R. at 453.) Vance reported that he completed the sixth grade and left school at the age of 15 following an incident in which he chased the principal with a gun. (R. at 453.) He was subsequently charged with attempted murder and was placed on one year of probation. (R. at 453.) He also reported involvement in physical altercations with his peers. (R. at 453.) Vance described his grades as poor, noting that he was retained three times in the fifth grade. (R. at 453.) He denied being fired from or disciplined on any job. (R. at 453.) Vance reported sleep disturbances due to pain. (R. at 454.) He reported receiving visits from two or three friends every two to three months, and he noted visiting a friend who

-17-

lived near his home every two weeks. (R. at 454.) Vance described his social functioning as significantly impaired. (R. at 454.)

Wyatt noted that Vance appeared to expend adequate effort across all tasks presented, and he was fully oriented. (R. at 454.) Vance's mood appeared anxious with a flat affect. (R. at 454.) His stream of thought was organized and logical with no evidence of thought content impairment. (R. at 454.) No evidence of hallucinations or delusions was noted. (R. at 454.) Vance's insight appeared limited, and his judgment appeared mildly impaired. (R. at 454.) His concentration was adequate, and his immediate memory was within normal limits. (R. at 454.) Wyatt opined that Vance's recent memory was markedly deficient, and remote recall appeared impaired. (R. at 454.) Vance's pace was moderately slow, and he appeared to experience significant physical discomfort throughout the interview and testing. (R. at 454.)

Wyatt administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), on which Vance achieved a verbal IQ score of 79, a performance IQ score of 70 and a full-scale IQ score of 73. (R. at 455.) Wyatt also administered the Wide Range Achievement Test - Third Revision, ("WRAT-3"), which indicated that Vance had a high-school reading ability, a third-grade spelling ability and a sixth-grade arithmetic ability. (R. at 455.) The Bender-Gestalt Visual-Motor Test revealed no neurological impairment. (R. at 456.) The Personality Assessment Inventory, ("PAI"), suggested impairment in functioning due to physical symptoms likely accompanied by depression and anxiety. (R. at 456.) The Beck Depression Inventory, ("BDI"), suggested moderate depressive symptom presentation and moderate anxiety-related symptoms. (R. at 456.)

-18-

Wyatt diagnosed Vance with a depressive disorder, not otherwise specified, an anxiety disorder, not otherwise specified, and borderline intelligence. (R. at 456.) She suggested participation in outpatient psychotherapy and a psychiatric consult. (R. at 456.) Wyatt considered Vance's prognosis to be guarded. (R. at 456.)

The same day, Wyatt completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), finding that Vance was moderately limited in his ability to understand, remember and carry out short, simple instructions, to make judgments on simple work-related decisions and to interact appropriately with supervisors and co-workers. (R. at 457-58.) Wyatt opined that Vance was markedly limited in his ability to understand, remember and carry out detailed instructions, to interact appropriately with the public, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 457-58.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in

this process, review does not proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 23, 2008, the ALJ denied Vance's SSI claim.  (R. at 13-23.)  The ALJ found that Vance had not engaged in substantial gainful activity since July 28, 2006, the application date. (R. at 15.)  The ALJ determined that the medical evidence established that Vance suffered from severe impairments, namely chronic back pain, osteoarthritis of the right knee, degenerative joint disease of the hands and feet, COPD, status post gunshot wound to the left shoulder/back, depression and anxiety.  (R. at 15.)  However, the ALJ found that Vance did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 15.)  In addition, the ALJ found that Vance had the residual functional capacity to perform light work limited by an inability to perform more than occasional climbing, stooping, kneeling, crouching and

crawling, by an inability to work at unprotected heights, around hazards or machinery and around extremes of cold, pollutants/irritants or vibrations. (R. at 17.) The ALJ further found that Vance needed to freely alternate between sitting and standing, he could have only occasional interaction with the general public and he was limited to the performance of unskilled, routine and repetitive tasks. (R. at 17.) Thus, the ALJ found that Vance was unable to perform any of his past relevant work. (R. at 21.) Based upon Vance's age, marginal education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that he could perform, including those of a bagger, a price changer and a small parts assembler. (R. at 22.) Therefore, the ALJ concluded that Vance was not under a disability as defined in the Act and was not entitled to SSI benefits. (R. at 22-23.) *See* 20 C.F.R. § 416.920(g).

In a separate decision dated the same day, the ALJ denied Vance's DIB claim. (Plaintiff's Brief, Exh. A.) The ALJ found that Vance met the insured status requirements of the Act for DIB purposes through December 31, 1995. (Plaintiff's Brief, Exh. A at 3.) The ALJ further found that Vance had not engaged in substantial gainful activity between September 10, 1993, his alleged onset date, through December 31, 1995, his date last insured. (Plaintiff's Brief, Exh. A at 3.) The ALJ found that, through the date last insured, Vance had severe impairments, namely chronic back pain, osteoarthritis of the right knee and degenerative joint disease, but she found that he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Plaintiff's Brief, Exh. A at 4.) The ALJ concluded that,

Case 1:08-cv-00019-JPJ-PMS   Document 21   Filed 05/28/09   Page 21 of 27   Pageid#: 542

through the date last insured, Vance had the residual functional capacity to perform light work, limited by occasional climbing, stooping, kneeling, crouching and crawling, an inability to work at unprotected heights or around hazards/hazardous machinery, and which allowed for a sit/stand option. (Plaintiff's Brief, Exh. A at 4.) Based on his age, marginal education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, Vance was unable to perform his past relevant work. (Plaintiff's Brief, Exh. A at 6.) The ALJ concluded that, through the date last insured, jobs existed in significant numbers in the national economy that Vance could perform, including those of a bagger, a price changer and a small parts assembler. (Plaintiff's Brief, Exh. A at 7.) Thus, the ALJ found that Vance was not disabled at any time from September 10, 1993, through December 31, 1995. (Plaintiff's Brief, Exh. A at 7.) *See* 20 C.F.R. § 404.1520(g).

Vance argues that the ALJ erred by failing to find that he met the listed impairment for mental retardation found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C. (Plaintiff's Brief In Support Of Summary Judgment, ("Plaintiff's Brief"), at 10-12.)

To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C, a claimant's condition must meet two requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function. The Secretary's regulations do not define the term "significant." However, this court previously has held that it must give the word its commonly accepted meanings,

among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *See* 581 F. Supp. at 159. The regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05C." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) (2008); *see Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211, (4th Cir. 1990).

During testing performed by psychologist Wyatt, Vance obtained a verbal IQ score of 79, a performance IQ score of 70 and a full-scale IQ score of 73. (R. at 455.) Vance argues that IQ testing performed by Wyatt revealed a valid IQ score between 60 and 70, thereby meeting the first prong of § 12.05C. I agree. As stated above, in cases where more than one IQ is customarily derived from the test administered, the lowest of these is used in conjunction with 12.05. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D) (2008). Vance's performance IQ score was assessed at 70. (R. at 455.) However, despite this score, Wyatt did not diagnose Vance with mental retardation. Instead, she concluded that he was functioning in the borderline range of intellect. (R. at 455.) The Commissioner argues that when an individual is diagnosed with borderline intellect, he cannot be found to meet the requirements of § 12.05C, relying in part, on a case from this district, which he states stands for the proposition that § 12.05 is not applicable when a claimant's IQ scores show borderline intellectual functioning. *See Brown v. Astrue*, 2008 WL 5455719, at *5, n.7 (W.D. Va. Dec. 31, 2008). However, I note that in the *Brown* opinion, the diagnosis of borderline intellectual functioning was based on an IQ score of 72 – a score outside the relevant

-23-

range for mental retardation. Thus, the *Brown* case is distinguishable from the case currently before this court. Here, Vance obtained a performance IQ score of 70 – a score that was not invalidated by Wyatt or any other psychological or psychiatric source in the record. The Commissioner further relies on *Maggard v. Apfel*, a Seventh Circuit case. *See* 167 F.3d 376 (7th Cir. 1999). Setting aside the fact that this case is not binding precedent on this court, I, nonetheless, find it distinguishable from the case before this court. In *Maggard*, the claimant's IQ scores were deemed invalid because the claimant had not eaten for two days preceding the test, and he had been drinking alcohol until 2:00 a.m. the day of the test, leading the administering physician to believe that such behavior had affected the test scores. *See* 167 F.3d at 380. As stated previously, there is no indication that Vance's IQ scores were not valid. Wyatt made no mention that Vance did not put forth his best effort on testing. In short, there is no reason to find that Vance's IQ scores were invalid, and to do so would be to improperly substitute the ALJ's opinion for that of a trained professional. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).

For these reasons, I find that Vance's impairment meets the first prong of § 12.05C. I next will turn to whether Vance has a physical or other mental impairment imposing additional and significant work-related limitation of function. I find that he does. The ALJ, in both her DIB and SSI decisions, specifically found so. In particular, in connection with her DIB decision, the ALJ found that Vance had the following severe impairments: chronic back pain, osteoarthritis of the right knee and degenerative joint disease. In connection with her SSI decision, the ALJ found that Vance had the following severe impairments: chronic back pain, osteoarthritis of the

Case 1:08-cv-00019-JPJ-PMS   Document 21   Filed 05/28/09   Page 24 of 27   Pageid#: 545

right knee, degenerative joint disease of the hands and feet, status post gunshot wound to the left shoulder/back, depression and anxiety. Additionally, the ALJ found in both decisions that Vance could not perform his past relevant work. The Fourth Circuit has held that if a claimant cannot return to his past relevant work, he has established a work-related limitation of function which meets the requirements of § 12.05C. *See Branhan v. Heckler*, 775 F.2d 1271, 1273 (4th Cir. 1985).

Finally, the introductory paragraph to § 12.05C makes it clear that mental retardation is a lifelong, and not acquired, disability. *See Smith v. Barnhart*, 2005 U.S. Dist. LEXIS 5975, at *10 (W.D. Va. Apr. 8, 2005). Thus, to qualify as disabled under this listing, a claimant also must demonstrate that he has had deficits in adaptive functioning that began during childhood. That being the case, I must determine whether substantial evidence supports a finding that Vance's impairment manifested itself during the developmental period, i.e., before age 22. I find that it did so. Specifically, the evidence before the court shows that Vance completed only the seventh grade, without attending any sixth-grade classes, and attending fifth grade classes for three years. Vance's overall grades were poor, including several Ds and Fs. (R. at 189.) Moreover, achievement testing performed during Vance's seventh-grade school year showed an overall composite score in the 19th percentile, a reading score in the 23rd percentile, a language arts score in the 9th percentile, a math score in the 35th percentile, a social studies score in the 7th percentile, a science score in the 9th percentile and a use of sources score in the 10th percentile. (R. at 190.) For these reasons, I am of the opinion that Vance's subaverage general intellectual functioning with deficits in adaptive functioning manifested itself before age 22.

For all of the above-stated reasons, I find that substantial evidence does not support the ALJ's finding that Vance's mental impairment does not meet the requirements for the listing for mental retardation found at § 12.05C. I note that, while for purposes of Vance's DIB decision, he had to show disability on or prior to December 31, 1995, he has done so given the assumption that mental retardation is a lifelong condition, and given that the ALJ specifically found that he suffered from other severe impairments during the time period relevant to a DIB decision.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence does not exist to support the Commissioner's finding that Vance's mental impairment does not meet the requirements of § 12.05C; and

2.  Substantial evidence does not exist to support the Commissioner's finding that Vance was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the Commissioner's motion for summary judgment, grant Vance's motion for summary judgment, vacate the decision of the Commissioner denying benefits and remand the case to the ALJ for an award of DIB and SSI benefits.

-26-

# Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 28th day of May 2009.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-27-